IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE PENNSYLVANIA STATE | : | |
| TROOPERS ASSOCIATION, BRUCE | : | |
| A. EDWARDS, JOSEPH E. SARKIS, | : | |
| JOSEPH M. PLANT, GERALD E. | : | |
| WILLIAMS, JR., DAVID M. BOVA, | : | |
| and JAMES A. SEAMON | : | CIVIL ACTION NO. 1:CV-09-1748 |
| Plaintiffs | : | |
| | : | Chief Judge Kane |
| v. | : | |
| | : | |
| FRANK E PAWLOWSKI, Individually | : | |
| and as Commissioner of the Pennsylvania | : | |
| State Police, JOHN R. BROWN, | : | |
| Individually and as Deputy Commissioner | : | |
| of the Pennsylvania State Police, and | : | |
| JEFFREY B. MILLER, Individually and | : | |
| as Commissioner of the Pennsylvania | : | |
| State Police, | : | |
| Defendants | : | |

## MEMORANDUM

Before the Court is Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), or in the alternative, for more definite statement pursuant to Rule 12(e). (Doc. No. 13.) Plaintiffs filed a brief in opposition to the motion, and the deadline to file a reply brief has passed. Accordingly, the motion is now ripe before the Court for disposition. For the reasons that follow, the motion will be granted in part and denied in part.

I. BACKGROUND

This case derives from the relationship between the Pennsylvania State Troopers Association ("PSTA"), a union with over 4,400 members, and the leadership of the Pennsylvania

State Police ("PSP"). Plaintiffs are all members of the PSP and hold leadership positions within the PSTA.[1]

The PSTA had been party to a collective bargaining agreement ("CBA") with the Commonwealth of Pennsylvania for over twenty years. (Doc. No. 1 ¶¶ 19, 26.) On June 30, 2008, however, the long-standing CBA expired. (Id.) At the expiration of the CBA, the Commonwealth and the PSTA proceeded to arbitration to resolve their differences and to negotiate a new CBA. (Id.) Plaintiffs state that the retaliation against them for associating with the union and for filing grievances began as early as 2003, when Defendant Jeffrey Miller was PSP Commissioner, but increased significantly after many of them testified at the arbitration hearings which occurred from September to October 2008 as part of the CBA renegotiations. (Id. ¶¶ 21, 29-30, 32.) The specific factual allegations, accepted as true for purposes of this motion, are as follows.

Plaintiff Sarkis

Plaintiff Sarkis has participated in multiple union activities throughout the course of his career with the PSP, including serving as Vice-President of the PSTA and Chairman of the PSTA grievance committee. As Chairman of the Grievance Committee, Sarkis processed nearly 1,450 grievances filed by union members, including some filed on his own behalf. (Id. 24.) Additionally, Sarkis testified at the arbitration proceedings regarding the CBA on September 12,

---

[1] Plaintiff Bruce Edwards is a Sergeant within the PSP serving as President of the PSTA; Plaintiff Joseph Sarkis is a Corporal within the PSP, serving as Vice-President of the PSTA and Chairman of the PSTA Grievance Board; Plaintiff Joseph Plant is a Trooper First Class within the PSP, serving on the PSTA Board of Directors, PSTA Grievance Board, and as a local union official; Plaintiff Gerald Williams is a Corporal within the PSP, serving on various PSTA Committees and as a local union officer; Plaintiff David Bova is a Corporal within the PSP, serving on various PSTA boards and committees, including the Grievance Board and the Board of Directors; Plaintiff James Seamon is a Corporal within the PSP, serving on the PSTA Board of Directors, as a local union officers, and various other committees. (Doc. No. 1 ¶¶ 2-7.)

2008. (Id. ¶ 26.)

Prior to the CBA renegotiations, Sarkis had routinely been granted administrative leave from his position as Polygraph Examiner to perform his duties for the Grievance Committee. (Id. ¶¶ 24, 29-30.) Beginning on or about November 2008, however, requests that Sarkis and others be released from duty to provide service to the union were stalled or denied by Defendants Pawlowski and Brown. (Id. ¶¶ 32, 33, 38.) Pawlowski and Brown stated that Sarkis's leave was denied because Sarkis's role as Polygraph Examiner was critical to the proper functioning of the department. (Id. ¶ 34, 37.) The PSTA disbelieved or disagreed with Defendants' decision and took the issue to an arbitrator. (Id. ¶ 36.)

On January 8, 2009, after the leave request was denied and arbitration was pursued, Sarkis was notified that he was selected for a quality control review for his polygraph examination work. (Id. ¶ 41.) Sarkis was selected for review though the department knew his significant administrative leave over the past year precluded him from having completed enough polygraph examinations during the relevant time period to substantiate a review. (Id. ¶¶ 40, 41, 45.) Despite the lack of work product, on March 8, 2009, the Polygraph Coordinator scheduled Sarkis for a March 11, 2009 review. (Id. ¶ 41.) Sarkis was "further advised that if the required files were not submitted by May 8, 2009, his future requests for administrative leave would be denied." (Id. ¶ 48.) Sarkis believed that the review proceedings were designed solely to harass him because the Polygraph Coordinator knew that Sarkis would be on administrative leave performing his union duties the week during for which the review was scheduled. (Id. ¶ 41.) A subsequent review was scheduled for April 23, 2009. (Id. ¶ 43.) Sarkis, concerned that the incomplete review would lead to a negative employment evaluation, learned from the Polygraph Coordinator that the quality control review would be cancelled if he withdrew from his position

3

as Polygraph Examiner. (Id. ¶ 47.) To avoid the potentially negative review, Sarkis offered to "voluntarily remove himself from the position of polygraph examiner, if the quality control review were cancelled." (Id. ¶ 47.) Notwithstanding his statement of resignation, Sarkis was ordered to submit the required files for quality control review. (Id. ¶¶ 47-48.) Sarkis submitted the files, and, on June 28, 2009, he was reassigned to the position of Troop R Staff Services Unit Supervisor, a position that consisted of no regularly assigned duties. (Id. ¶ 51.) Though he had no regularly assigned duties in this new position, Pawlowski and Brown continued to deny his administrative leave requests. (Id. ¶ 52.)

Plaintiffs Williams and Plant

Plaintiff Williams worked as a Polygraph Examiner at the PSP, while serving in the union leadership as a local union Vice-President and a member of the Negotiating Committee. (Id. ¶ 94.) Plaintiff Williams also attended the CBA arbitration negotiations as a member of the Negotiating Committee. (Id. ¶ 96.) On September 10, 2008, the same day he attended the hearings, he received an e-mail from a bargaining unit member regarding the union proposals being advanced during the arbitration proceedings. (Id. ¶¶ 95-97.) In his capacity as a PSTA official, Williams responded to the e-mail, supporting the union proposals and criticizing PSP policy and leadership. (Id. ¶ 98.) Defendant Brown learned of the e-mail and, on October 10, 2008, initiated an Internal Affairs Division ("IAD") investigation into Williams on the basis that Williams's e-mail was "disparaging toward the Department and command staff." (Id. ¶ 99.) The IAD investigation was conducted by one of Brown's subordinates, rather than by a neutral supervisor external to the allegations. (Id. ¶ 101.) The investigation resulted in disciplinary action against Williams. (Id. ¶ 103.) By contrast, participants in the IAD investigation who had written "disparaging and vicious" e-mails critical of the PSTA position were not investigated and

4

did not receive discipline. (Id. ¶ 102.)

Plaintiff Plant has been a member of the Board of Directors and Grievance Committee for a number of years. He has processed nearly 500 grievances filed by PSP members, including some on his own behalf. (Id. ¶ 65.) Beginning at an unidentified time in 2008, members of the Troop P Wyoming staff complained to Plaintiffs Plant and Williams, in their capacities as PSTA officials, that Captain Willard Oliphant was abusing Commonwealth resources by bringing his personal trash to the station to be emptied by lower-ranking officers. (Id. ¶¶ 69-71, 108-10.) This allegation was particularly harmful given Captain Oliphant's position as commander of the Bureau of Integrity and Professional Standards, Internal Affairs Division. (Id. ¶ 66.) Plant and Williams reported the improper conduct to Brown. (Id. ¶ 72, 111.) Though internal investigations into such a complaint would traditionally have been assigned to a disinterested supervisor from a different Troop, Brown and Pawlowski assigned the investigation into Oliphant's conduct to one of Oliphant's subordinates. (Id. ¶¶ 73-74, 113.) The internal investigation found that Plant and Williams were "misrepresenting facts" and "conducting an unauthorized investigation." (Id. ¶ 75, 113.) A disciplinary action against Plant and Williams was initiated on June 5, 2009, in consideration of the findings of the internal investigation. (Id. ¶ 76, 114.)

On August 18, 2009, a PSTA newsletter publicized the treatment Plaintiff Williams received with respect to his complaint against Oliphant. (Id. ¶ 116.) On August 24, 2009, after they received word of the newsletter, Defendants Pawlowski and Brown forbid Williams from continuing to perform his duties as Polygraph Examiner, though he had been performing such duties continuously despite the disciplinary action of June 5, 2009. (Id. ¶ 117, 118.)

Plaintiff Bova

5

Plaintiff Bova is a Patrol Corporal in Troop B Washington. (Id. ¶ 138.) As Patrol Corporal, Bova did the scheduling for all members of the patrol unit. (Id.) Bova is also a union official, serving on both the Grievance Committee and the Board of Directors. (Id. ¶ 136.) One of his duties as union official is to process grievances for members. (Id. ¶ 137.)

On April 18, 2008, Bova, in his capacity as a union representative, attempted to accompany a union member with a grievance into a meeting with the member's supervisor. (Id. 139.) Though the supervisor knew Bova was attending the meeting in such capacity, he ordered Bova to leave. (Id.) A grievance was filed against the supervisor ("first grievance") because a union representative is entitled to be present at a member's disciplinary meetings.[2] (Id.) On April 22, 2008, Defendants Miller and Brown are believed to have initiated an IAD investigation against Bova for "intimidation" and "insubordination." (Id. 140.) Bova then filed a grievance ("second grievance") alleging that the IAD investigation was an act of retaliation against him in response to the first grievance. (Id. ¶ 141.) The IAD investigation was discontinued after the second grievance was filed. (Id.)

On January 24, 2009, Bova was informed that a reorganization of sergeants within the Troop was going to occur, but that he would remain as the scheduler because he had been doing a good job in the position. (Id. ¶¶ 143-44.) Just two days later, however, Bova was notified that he was being removed from the scheduler position. (Id. ¶ 145.) Bova believes that Defendants Brown and Pawlowski recommended his relief from scheduling duties and recommended that the IAD investigation against him be initiated. (Id. ¶ 146.)

Plaintiff Seamon

---

[2]The complaint does not indicate whether Bova filed the subsequent grievance or whether the unnamed union member filed it. The complaint also omits the date the grievance was filed.

Plaintiff Seamon has also served as a member of the PSTA Board of Directors for many years and processed numerous grievances for members. (Id. ¶ 160.) Additionally, Seamon has helped prosecute charges of unfair labor practices by the PSP. (Id.) His position with the PSP is that of Patrol Corporal in Troop R Dunmore. (Id. ¶ 161.)

On June 10, 2009, Plaintiff Seamon made an internal complaint to his supervisor that another officer, Major John Rice, was consistently engaging in personal business during work hours. (Id. ¶ 162.) Rather than investigating Seamon's complaint against Rice, the IAD began an investigation into Seamon. (Id. ¶ 163.) The IAD investigator threatened other officers that they would be met with opposition from the Department if they did not give statements against Seamon. (Id. ¶ 163.)

On June 17, 2009, Seamon made another complaint, this time, a formal complaint as a union official about the behavior of IAD investigator Sergeant Fred Tollerico for his conduct in investigating another union member. (Id. ¶ 165.) On July 9, 2009, Tollerico subjected Seamon to a four-hour interrogation about events outside the scope of his recently-filed complaints. (Id. ¶ 166.) Plaintiff Seamon believes that Defendants Brown and Pawlowski authorized the interrogation and expansion of the IAD investigation into other areas. (Id. ¶¶ 168-69.)

Plaintiffs assert that the above facts indicate violations of their First Amendment rights to associate and to petition the Government for redress of grievances without suffering retaliation. Plaintiffs Seamon, Williams, and Plant also bring claims pursuant to the Pennsylvania Whistleblower's Act. In this motion, Defendants argue that the retaliation for petitioning claims must be dismissed because Plaintiffs have not alleged protected petitioning activity. Defendants also argue that the PSTA lacks standing to bring claims on its own behalf, Plaintiff Edwards has not alleged any personal injury, Plaintiffs have not alleged specific actions against Defendant

Miller, and qualified immunity applies.

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint, Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993), and is properly granted when, taking all factual allegations and inferences as true, the moving party is entitled to judgment as a matter of law. Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990). The burden is on the moving party to show that no claim has been stated. Johnsrud v. Carter, 620 F.2d 29, 33 (3d Cir. 1980). Thus, the moving party must show that Plaintiff has failed to "set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that those elements exist." Kost, 1 F.3d at 183 (citations omitted). A court, however, "need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906, 908 (3d Cir. 1997). Indeed, the Supreme Court has recently held that while the 12(b)(6) standard does not require "detailed factual allegations," there must be a "'showing,' rather than a blanket assertion of entitlement to relief. . . . '[F]actual allegations must be enough to raise a right to relief above the speculative level.'" Phillips v. County of Allegheny, 515 F.3d 224, 231-32 (3d Cir. 2008) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Put otherwise, a civil complaint must "set out 'sufficient factual matter' to show that the claim is facially plausible." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1955 (2009)).

## III. DISCUSSION

### A. Petitions Need not Pertain to Matters of Public Concern to be Protected

Defendants first argue that Plaintiffs' claims, though they allege retaliation in response to petitioning activity and not speech, should be analyzed under the rubric of Supreme Court and

8

Third Circuit cases regarding freedom of speech. The difference between speech retaliation claims and petitioning retaliation claims is that a public employers' retaliation against speech is only actionable if the speech pertains to a matter of public concern, whereas retaliation against petitioning activity is actionable regardless of whether the petition pertains to a matter of public concern. San Filippo v. Bongiovanni, 30 F.3d 424, 435 (3d Cir. 1994). The distinction is imperative to this case because Plaintiffs concede that the petitions at issue do not pertain to matters of public concern.

In San Filippo, the Third Circuit specifically considered, and squarely rejected, the possibility that a petition must be grounded in a matter of public concern to be the foundation of a § 1983 retaliation claim. San Filippo, 30 F.3d at 440. The court stated:

> [E]ach circuit court to consider the issue has held that a public employee who alleges that he or she was disciplined in retaliation for having filed a lawsuit against his or her employer does not state a claim under § 1983 unless the lawsuit addressed a matter of public concern. . . .[W]e find ourselves unable to subscribe to the reasoning of our sister circuits.

Id. Defendants admit that San Filippo controls; they simply argue that the holding is contrary to sound policy. Regardless of Defendants' disagreement with the case, the San Filippo result is not directly in conflict with any Supreme Court or other Third Circuit precedent, and it remains the law of the circuit. Indeed, it has been reaffirmed many times and is binding on this Court. See, e.g., Foraker v. Chaffinch, 501 F.3d 231, 237 (3d Cir. 2007) ("[P]etitions are not synonymous with speech for purposes of constitutional analysis."); Hill v. City of Scranton, 411 F.3d 118, 126 (3d Cir. 2005) ("In this circuit, any lawsuit brought by an employee against a public employer qualifies as a protected 'petition' under the First Amendment so long as it is not 'sham litigation.'"). Accordingly, the Court holds that Plaintiffs' petitions need not relate to a matter of public concern to receive First Amendment protection from a public employer's retaliatory

9

response to such petitions. Accord Pollock v. City of Ocean City, 968 F. Supp. 187, 192 (D.N.J. 1997) ("San Filippo remains the law of this Circuit to which this Court must adhere.").

## B. Union Grievances Constitute Petitions Under the First Amendment

Defendants next contend that Plaintiffs' claims must fail because the union grievance procedure does not constitute a "petition" within the ambit of First Amendment protection. Defendants argue that the grievances produced pursuant to the official PSP grievance process should not be considered petitions because the process culminates in arbitration rather than government action. The Court disagrees.

In San Filippo, the Third Circuit Court of Appeals made clear that grievances which "invoke formal mechanisms for the redress of grievances," are worthy of First Amendment protection because without protection for such grievances, "the petition clause of the first amendment would . . . be a trap for the unwary." San Filippo, 30 F.3d at 439, 442. Specifically, the court noted that "one example of a formal governmental adoption of a mechanism for redress of grievances is entry into a collective bargaining agreement that provides for a grievance procedure." Id. at 442. Thus, San Filippo explicitly recognized that grievances filed pursuant to a formal CBA grievance procedure constitute First Amendment petitions, without distinguishing grievance procedures culminating in arbitration rather than court action. Id. at 442, 440 n.18. Defendants provide no support for their bald conclusion that formal grievances are not petitions for First Amendment purposes if they culminate in arbitration rather than court action.

Accordingly, the Court concludes that all grievances filed pursuant to the CBA-approved grievance procedure are protected petitions.

## C. Other Protected Petitioning Activity

Plaintiffs' petitioning claims require further analysis because Plaintiffs have alleged other

potentially-protected activities in addition to the formal complaints each Plaintiff filed on his own behalf pursuant to the CBA-approved grievance procedures. For example, the complaint states that each Plaintiff, in his respective union position, "processed and presented numerous grievances on behalf of the members of the bargaining unit." (Doc. No. 1 ¶ 20.) The complaint also avers that Plaintiffs Sarkis and Williams participated in the Act 111 interest arbitration in renegotiation of the CBA. (Id. ¶¶ 26, 95.) Plaintiffs also appear to allege, at points, that their informal complaints to superiors provided an impetus for retaliation. Although the Court held oral argument to determine whether testimony before the Act 111 arbitrator during CBA negotiations and processing of others union members' grievances pursuant to the CBA formal grievance procedure constitute protected activity, it did not become apparent from argument to what extent Plaintiffs' retaliation claims depend upon the arbitration hearings, the informal complaint activities, and the "processing grievances" activities. Because the Court cannot discern which alleged actions may have been motivated by which potentially protected activity, the Court will grant Defendants' motion for a more definite statement.

To guide Plaintiffs in amending their complaint, the Court will illustrate its concerns using the allegations made by Plaintiff Sarkis. Sarkis pleads that he "processed nearly 1,450 grievances filed by members of the PSP, including some filed on his own behalf." (Doc. No. 1 ¶ 24.) He states that he attended arbitration hearings related to the CBA negotiations on September 12, 2008. (Id. ¶ 26.) He also contends that, on December 21, 2008, he "proceeded to invoke the jurisdiction of an arbitrator to review the denial of release pursuant to the collective bargaining agreement." (Id. ¶¶ 36-37.) In retaliation, Sarkis avers that, beginning in late 2008 and continuing into the first half of 2009, he was denied leave to perform his union functions, harassed by Defendants, and constructively discharged.

While the Court agrees that Sarkis has pleaded conduct sufficient to deter a person of ordinary firmness from engaging in protected activities, he has not affirmatively connected the harassment, demotion, or denial of leave time to formal grievances he filed on his own behalf. Indeed, he has not provided information related to the dates or the content of the grievances he filed so that a fact-finder would have reason to infer that the retaliation was in response to the protected activity. As to the grievances he processed on the behalf of others members, he does not indicate when he began his position with the Grievance Committee so as to create any causal connection through temporal proximity with the recent denial of leave and harassment, and he provides no reason to suggest that, if he had been in the position for many years, why only now this protected conduct would motivate Defendants to deny him leave and to harass him. Further, it is unclear whether "invok[ing] the jurisdiction of an arbitrator," which he alleges he did when his leave was initially denied, was done as the final step of the formal grievance process or outside the formal grievance process established pursuant to the CBA.

As a result, Defendants, and the Court, are left to guess whether Sarkis actually bases his retaliation claim upon the personally-filed and clearly protected formal grievances, his Grievance Committee activities, or the potentially informal arbitration regarding his leave denial. The only allegation in the complaint that raises an inference through temporal proximity that it motivated Defendants' punitive conduct is Sarkis's participation in the CBA negotiations. Rather than make an unnecessary or premature determination as to whether Sarkis' participation in the CBA negotiations qualifies as petitioning—something this Court is unprepared to do on the meager record before it regarding the Act 111 arbitration and negotiation process—the Court will order Sarkis, and all other Plaintiffs, to clarify their claims in an amended complaint.

Moreover, Plaintiffs refer a number of times to informal complaints about other officers'

misconduct, and it is unclear whether Plaintiffs aver that these informal complaints, their official grievances, or their actions in processing grievances are protected activity for which they believe they were retaliated against. Plaintiffs do not provide sufficient factual allegations related to these informal complaints for the Court to determine whether they suffice even at the pleadings stage to be considered protected activity. The Court notes that an informal complaint may constitute petitioning activity worthy of some constitutional protection. Foraker, 501 F.3d at 237. But, an internal complaint "up the chain of command" is not protected activity when done pursuant to one's work obligations. Foraker, 501 F.3d at 247 ("[C]omplaints within the chain of command . . . are not petitioning activity entitled to protection under the First Amendment."). To constitute petitioning activity, a less formal mechanism of complaint must be made to a "state agency qua agency," rather than to "an employer, which also happen[s] to be a state agency." Id. at 237. In these respects, the inquiry into whether the complaint is made pursuant to one's job duties is a mixed question of law and fact.

Accordingly, the Court will grant Defendants' motion for a more definite statement. Plaintiffs are directed to use the above guidelines to amend their complaint to clarify which activities they allege merit First Amendment protection and motivated Defendants' retaliatory actions. Plaintiffs are further directed to provide more factual allegations regarding all complaints outside the official CBA grievance process that they believe should be characterized as petitions.

**D.     Plaintiffs PSTA and Edwards**

Defendants next challenge the allegations brought by Plaintiffs PSTA and Edwards. First, Defendants argue that the PSTA lacks standing to bring its claim. Defendants admit, however, that an organization can have standing either if it seeks recovery for injury to itself or it brings claims on behalf of individual members who themselves have standing. Pennsylvania Prison

13

Soc. v. Cortes, 508 F.3d 156, 163 (3d Cir. 2007). Here, the PSTA alleges injury to itself due to Defendants' intimidation of its members. (Doc. No. 1 ¶¶ 196-97.) The injuries alleged—lower membership, discouragement from leadership positions, and unnecessary obstacles to performing union duties—are sufficiently concrete and palpable to meet the standing inquiry at the pleadings stage. Pennsylvania Prison Soc., 508 F.3d at 165. Defendants do not challenge any other aspect of the standing inquiry, therefore, Defendants' motion to dismiss the PSTA for lack of standing will be denied.

With respect to Plaintiff Edwards, however, the motion to dismiss will be granted. Edwards pleads no specific injury to himself or action against himself which could be seen as giving rise to a claim. Moreover, there is nothing in the complaint to indicate how Edwards, in his role as President of the PSTA, has standing to bring claims on behalf of other members of the association when each member with a claim appears to bring such claim on his own behalf. Edwards's claims will be dismissed.

### E.     Dismissal of Claims Against Defendant Miller

Defendants argue that the PSTA's claims against Defendant Miller should be dismissed since they are brought only in his official capacity as PSP Commissioner, and he no longer serves in that position. It is true, as Defendants argue, that in Brandon v. Holt, 469 U.S. 464 (1985), the Supreme Court held that official capacity suits are essentially suits against the state or municipality, and that, where an official of such entity is sued in his initial capacity but is replaced by another official during the course of litigation, the newly-appointed official should automatically be substituted as the named defendant. Id. at 470-72. Plaintiffs do not respond to this argument. Accordingly, the motion will be granted. Defendant Miller is dismissed from Count XIV, however, the personal allegations brought against him by Defendant Bova in Count

14

IX are not dismissed.

### F. Qualified Immunity

Defendants contend that they are entitled to qualified immunity for all claims brought against them in their individual capacities because the law was not clearly established at the time of their conduct. The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 129 S.Ct. 808, 815 (2009).

Despite Defendants' attempts to cast doubt upon the clarity of Third Circuit Court of Appeals precedent with respect to whether petitioning activity includes complaints that do not involve matters of public concern, such petitions have been entitled to First Amendment protection from retaliation in this circuit for fifteen years. Not only was San Filippo good law at the time of Defendants' alleged misconduct, but it was not novel. Because the Court has found that Plaintiffs have asserted violations of their constitutional rights based on their filing and processing of grievances pursuant to the formal grievance procedure provided in the CBA, Defendants' motion for qualified immunity will be denied.

### G. Pennsylvania Whistleblower Claims

Defendants next argue that Plaintiffs' claims brought pursuant to the Pennsylvania Whistleblower Law, 43 P.S. § 1423, must be dismissed. Defendants contend that the allegations made by Plaintiffs do not demonstrate that they made good faith reports of "wrongdoing" or "waste", as the statute requires. The Court agrees.

The Pennsylvania Whistleblower Law provides:

> No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation,

> terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.

43 P.S. § 1423. The terms "waste" and "wrongdoing" are defined in 43 P.S. § 1422. "Waste" is statutorily defined as "an employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources," and "wrongdoing" is defined as "a violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." 43 P.S. § 1422. A complaint must allege "violations of statutes or regulations that are 'of the type that the employer is charged to enforce'" and that also are more than "merely technical or minimal" to allege "wrongdoing" sufficient to form the basis of a Whistleblower Law claim. Golaschevsky v. Commonwealth Dep't of Envir. Protection, 720 A.2d 757, 759 (Pa. 1998).

First, the Court turns to Plant and Williams's complaint against Captain Oliphant. Plant and Williams complained to superiors that Captain Oliphant was "bringing his trash to the Troop P Wyoming station to have it disposed of by personnel assigned to the Troop P Wyoming station." (Doc. No. 1 ¶¶ 69, 108.) Plaintiffs then vaguely state, without reference to any particular regulation, that "the utilization of subordinate personnel to conduct personal chores or business is prohibited by PSP regulations." (Id. ¶¶ 70, 109.) The Whistleblower Law specifically exempts complaints of misconduct that are not prefaced upon the violation of a particular law or regulation from its protections of complaints of wrongdoing. Plaintiffs do not proffer the statute or regulation that Oliphant allegedly violated, accordingly, their complaint falls short of an

16

allegation of "wrongdoing" as supposed by the Pennsylvania Whistleblower Law.

The complaint also fails to qualify as a complaint of "waste" under the Whistleblower Law. To qualify as a complaint of "waste" under the Whistleblower Law, the grievance must allege that the waste committed was substantial. No facts have been alleged to indicate that Captain Oliphant's abuse of police resources by bringing his trash to the station was more than an annoyance to subordinate officers. Plaintiffs Plant and Williams do not adequately allege that their complaint against Oliphant apprised the PSP of misconduct that constituted more than a de minimis disruption of official police activity. Accordingly, their Whistleblower claim must be dismissed.

Turning to Plaintiff Seamon's claim, he alleges that he "reported to the Troop R Commander that Major John Rice was consistently spending a considerable amount of time each day engaging in personal business when he was supposed to be working." (Doc. No. 1 ¶ 162.) As with Plaintiffs Plant and Williams, this allegation is simply too vague to support a claim under the Whistleblower Law. Plaintiff Seamon does not articulate a statute or regulation that Rice violated by doing personal business during working hours, thus the internal grievance does not meet the statutory standard of a complaint of "wrongdoing." Seamon also does not indicate how Rice's "personal business" constitutes substantial abuse of police resources, or misuse or loss of funds to the PSP. This allegation, as with the other Whistleblower Act claims, will be dismissed.

## V. CONCLUSION

For the reasons set forth in the foregoing, Defendants' motion for more definite statement will be granted, and the motion to dismiss will be granted in part and denied in part. Plaintiff Edwards' claims will be dismissed, as will all claims brought pursuant to the Pennsylvania Whistleblower law. Defendant Miller will be dismissed from Count XIV. In all other respects,

Defendants' motion to dismiss will be denied. Plaintiffs are given thirty (30) days to amend their complaint.

An order consistent with this memorandum will follow.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE PENNSYLVANIA STATE TROOPERS ASSOCIATION, BRUCE A. EDWARDS, JOSEPH E. SARKIS, JOSEPH M. PLANT, GERALD E. WILLIAMS, JR., DAWID M. BOVA, and JAMES A. SEAMON<br>      Plaintiffs<br><br>      v.<br><br>FRANK E PAWLOWSKI, Individually and as Commissioner of the Pennsylvania State Police, JOHN R. BROWN, Individually and as Deputy Commissioner of the Pennsylvania State Police, and JEFFREY B. MILLER, Individually and as Commissioner of the Pennsylvania State Police,<br>      Defendants | CIVIL ACTION NO. 1:CV-09-1748<br><br>**Chief Judge Kane** |

## ORDER

**AND NOW** this 16th day of June 2010, **IT IS HEREBY ORDERED THAT** Defendant's motion to dismiss or for more definite statement (Doc. No. 13) is **DENIED IN PART** and **GRANTED IN PART.** Plaintiff Edwards's claims will be dismissed, as will all claims brought pursuant to the Pennsylvania Whistleblower Law. Defendant Miller will be dismissed from Count XIV. Plaintiffs are given thirty (30) days from the date of this order to amend their complaint to clarify which activities they allege are protected petitioning activity and to allege causation between the protected activity and the alleged retaliatory actions. In all other respects, the motion is denied.

                                                                            S/ Yvette Kane
                                                                Yvette Kane, Chief Judge
                                                                United States District Court
                                                                Middle District of Pennsylvania